UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

SUSAN ELLEN GUIDO,

        Plaintiff,

-vs-                                            Case No.  5:03-cv-231-Oc-10GRJ

CITY OF CRYSTAL RIVER, FLORIDA,
JAMES FARLEY, individually,

        Defendants.
_____

## **O R D E R**

This case is before the Court for consideration of the Defendant's Motion for Summary Judgment (Doc. 35), to which the Plaintiff has responded (Doc. 40). The motion is ripe for review and the Court concludes that it is due to be granted.

## **PROCEDURAL HISTORY**

This is an action under 42 U.S.C. § 1983 and Florida's Whistle-blower's Act, § 112.3187, Fla. Stat.  Susan Guido, a former records clerk for the police department in the City of Crystal River, Florida, asserts her claims against the City of Crystal River and its former Chief of Police, James Farley, in his individual capacity.  On November 21, 2003, the Court dismissed the Plaintiff's Florida Whistle-blower's Act claim against Defendant James Farley, in his individual capacity, with prejudice (Doc. 17).  The case was held in abeyance and administratively closed (Doc. 19) pursuant to the stipulation of the parties that the facts and issues of the case are the same or almost identical to those of Ballard

v. City of Crystal River, Case No.: 5:02-cv-240-Oc-10GRJ, in which the Court granted summary judgment in favor of the City of Crystal River and Chief Farley. The Court's order abating the action provided that any party could move at any time to reopen the case upon the rendering of the Eleventh Circuit's decision in Plaintiff Ballard's appeal of the summary judgment order. The Eleventh Circuit subsequently affirmed the Court's order in all respects.[1] On February 3, 2005, Plaintiff Guido moved to reopen her case, and the Court subsequently granted her motion, but only for the limited purpose of resolving the Plaintiff's claim under Florida's Whistle-blower's Act against the City of Crystal River (Doc. 27).

## STATEMENT OF FACTS

The Plaintiff became employed as a records clerk for the Crystal River Police Department in November of 1995.[2] The Plaintiff's basic job duties included answering the phone, filing, entering reports, tickets and citations, checking on supplies and equipment, and running statistical reports.[3] During the Plaintiff's employment with the police department, she generally received good evaluations and annual raises.[4] In fact, in January of 2003, she was selected as employee of the month by Chief Farley.[5]

---

[1] Ballard v. City of Crystal River, Case No.: 5:02-cv-240-Oc-10GRJ, at Doc. 72 (Ballard v. City of Crystal River, No. 04-10268 (11th Cir. July 20, 2004) (unpublished decision)).

[2] Doc. 36, Part 2, Deposition of the Plaintiff, pg. 6, 9.

[3] Id. at 9.

[4] Id. at 14-15.

[5] Doc. 36, Part 3, Deposition of the Plaintiff, pg. 37. The Plaintiff felt like the award (continued...)

In October of 2001, the Plaintiff attended a meeting held by Chief Farley.[6] At the meeting, Chief Farley advised police department employees that there were three people running for city council who could be harmful to the police department. Specifically, Chief Farley told police department employees that if these individuals were elected, they would probably try to eliminate the police department, consolidate it with the sheriff's department, and all of the current police department employees would be out of work.[7] Chief Farley did not threaten to terminate the Plaintiff's employment if she did not vote for a certain candidate, he only asked that if any police department employees were in town in local businesses, off duty, and out of uniform, to stress to businesses how harmful these three council members would be if they were elected.[8] The Plaintiff disagreed with Chief Farley's speech because she did not believe he should be involved in political activities.[9] The Plaintiff also believed that it was improper for Chief Farley to ask police department employees to go out into the city and try to tell people how to vote.[10]

---

[5](...continued)
was a "bribe" and was "not genuine." Id. at 43-44.

[6]   Doc. 36, Part 2, Deposition of the Plaintiff, pg. 23.

[7]   Id.

[8]   Id. at 23-24.

[9]   Id. at 24.

[10]   Id.

3

On January 10, 2002, the Plaintiff reported her concerns about Chief Farley's actions at the October 2001 meeting to the then city manager, Phil Lilly.[11] The following day, the Plaintiff met with Mr. Lilly again, while Chief Farley was present, and she reported her concerns about Chief Farley smelling of alcohol and her disapproval of Chief Farley's October meeting.[12]

Between January and February of 2002, the city attorney conducted an investigation into the October meeting held by Chief Farley.[13] The Plaintiff gave a deposition as part of the city attorney's investigation.[14]

During 2002 and 2003, the Plaintiff claims that she was harassed by two of her co-workers at the police department, Sergeant Kat Klyap and Lieutenant Michael Klyap, and Chief Farley failed to address the situation after she complained. Between March and April of 2002, the Plaintiff stated that:

> Tensions rose in our office. The Klyaps seemed to feel I was an easy target for harassment. Sarcastic remarks, constant use of the door next to my desk which because of double locks required them to put there [sic] items they would be carrying down onto my desk and almost purposefully interfering with my work (like pawn tickets etc) which would end up in disarray.......they were asked to use the back door – officer door – to prevent problems.....only seemed to make matters worse. I spoke to the Chief frequently as the disruptions (especially from Kat Klyap) were tiresome and causing delays in work getting done. At some point in this time frame Sgt. Kat Klyap blocked

---

[11]   Id. at 25-26.

[12]   Doc. 40, Exh. 2, Plaintiff's Answers to Interrogatories, Interrogatory No. 1.

[13]   Doc. 36, Part 2, Deposition of the Plaintiff, pg. 27.

[14]   Id.

> Sarah Siner and I in Sarah's office to lecture us and straighten out issues...she blocked us from going thru the door even though we told her we had people in the lobby and those people could see us there and we needed to wait on them...that is our job.....finally Sarah pushed to the door and went to lobby...Sgt. Klyap finished with me in tears......I and Sarah both advissed [sic] the Chief of what had happened in a meeting later on...he said again he would handle it...however everytime [sic] he spoke to her the harassment got worse.[15]

Toward the end of April of 2002, the Plaintiff noted that Sergeant Klyap "was extremely rude" when the Plaintiff questioned her about an ad she ran in the paper for transcribers, and Sergeant Klyap "left some type of musical toy on [her] desk and a tacky note."[16] In addition, Sergeant Klyap would come through her work space and alter things on her desk and taunt her.[17] In May of 2002, the Plaintiff filed a harassment complaint against Sergeant Klyap for blowing a loud horn in her ear while she was working with customers in the lobby.[18] The Plaintiff filed a written complaint with the individual in charge of internal affairs at the police department – Lieutenant Michael Klyap, Sergeant Klyap's husband.[19] The Plaintiff testified that Sergeant Klyap received a verbal warning for her first offense, but the Plaintiff had no way knowing if she was disciplined for sure since when the Plaintiff filed the

---

[15]   Doc. 40, Exh. 2, Plaintiff's Answers to Interrogatories, Interrogatory No. 1.

[16]   Id.

[17]   Doc. 36, Part 3, Deposition of the Plaintiff, pg. 37-38.

[18]   Id. at 34-35.

[19]   Id. at 34.

complaint, Sergeant Klyap's husband threw it on the floor and laughed.[20] The Plaintiff also felt that Lieutenant Klyap retaliated against her by not handling her complaints against his wife and commenting after her vehicle was damaged in the police department parking lot that she was probably getting what she deserved.[21] In early 2003, the Klyaps were on military leave and the Plaintiff stated that "all was quiet" at the police department.[22] In May of 2003, the Plaintiff noted that Sergeant Klyap was joking about that the "I.A." that was done on her and stated that "we couldn't touch her."[23] And between August and September of 2003, Sergeant Klyap taunted the Plaintiff about losing her job and constantly came through the front door of the Plaintiff's office and disrupted the Plaintiff's work.[24]

In May of 2003, the Plaintiff was notified by the Chief Farley that her position was being eliminated.[25] Although the Plaintiff admitted in her deposition that she did not personally know who makes the final decision with respect to layoffs for the City, the Plaintiff was originally told by Chief Farley that the city manager, Susan Boyer,[26] and the

---

[20]  Id. at 35.

[21]  Id. at 38.

[22]  Doc. 40, Exh. 2, Plaintiff's Answers to Interrogatories, Interrogatory No. 1.

[23]  Id. (internal quotations omitted).

[24]  Id.

[25]  Doc. 36, Part 2, Deposition of the Plaintiff, pg. 10.

[26]  Susan Boyer was the City Manager for the City of Crystal River between October
(continued...)

finance director, Donna Kilbury, made the decision to eliminate her position.[27] The Plaintiff testified that later Ms. Kilbury told her that it was entirely Chief Farley's decision to eliminate the Plaintiff's position, and it was not the first time he tried to eliminate her position.[28] Ms. Kilbury testified that she attended a meeting with Ms. Boyer and Chief Farley in March or April of 2003, and after Ms. Boyer asked Chief Farley to significantly cut the police department budget, Chief Farley suggested eliminating the Plaintiff's position.[29] Ms. Kilbury admitted, however, that although Chief Farley may make a suggestion, changes to the budget may be made by the city council before it is approved.[30]

Despite the Plaintiff's claims, Ms. Boyer testified that she was responsible for the elimination of the Plaintiff's position. Ms. Boyer testified that as City Manager, she proposed a recommended budget to the city council.[31] Ms. Boyer further testified that due to necessary budget cuts for the 2003 - 2004 fiscal year, that in addition to budget cuts in several other departments, she "instructed Chief Farley to prepare a proposed budget incorporating the elimination of the junior records clerk position in the police department,

---

[26](...continued)
2002 and May 2005. Doc. 36, Part 4, Affidavit of Susan R. Boyer, pg. 1.

[27]   Doc. 36, Part 2, Deposition of the Plaintiff, pg. 10.

[28]   Id. at 10-11.

[29]   Doc. 44, Deposition of Donna Kilbury, pg. 3-5, 16.

[30]   Id. at 10, 19.

[31]   Doc. 36, Part 4, Affidavit of Susan R. Boyer, pg. 2.

which at that time was held by Susan Guido."[32]  According to Ms. Boyer, eliminating this position made sense since the city council did not want the budget cuts to result in a lower level of service to the community, which would likely have resulted from the elimination of a police officer position.[33]  Ms. Boyer stated that Chief Farley generally opposed budget cuts for the police department and was not pleased with her instructions to eliminate the records clerk position within the department.[34]  In fact, at a budget workshop meeting in 2003, Chief Farley compiled a report illustrating the need for the police department to maintain its current level of administrative positions and argued that it sent a bad message to city employees and the community if years of hard work and dedication result in dismissal.[35]  But Ms. Kilbury testified that Chief Farley changed his position on supporting the elimination of the Plaintiff's position and prepared this information after he felt like there was support on the city council for keeping the Plaintiff's position.[36]

Ultimately, the city council agreed to cut the records clerk position at the police department.[37]  And according to city personnel rules, "layoff shall be in reverse order of

---

[32] Id. at 2-3.

[33] Id. at 3.

[34] Id. at 2.

[35] Doc. 36, Part 5, Affidavit of James Farley, pg. 2.

[36] Doc. 44, Deposition of Donna Kilbury, pg. 11.

[37] Doc. 36, Part 4, Affidavit of Susan R. Boyer, pg. 3.

total continuous years of service with the City."[38]  Since the Plaintiff was the least senior records clerk, she was selected for layoff.[39] The Plaintiff's last day of employment with the police department was on September 30, 2003.[40]

After the Plaintiff learned that her position was going to be eliminated, she was offered an executive secretary position under the public works director.[41]  The Plaintiff did not accept the position because she did not feel she was qualified for the job.[42]  The Plaintiff also received a letter from the city stating that if a position became available within the next eighteen months, she would have "recall rights" to the position.[43]  In fact, for the 2005-2006 budget year, the City had sufficient funds to reestablish the records clerk position; and once the position was reestablished, the Plaintiff was hired to fill the position.[44]

The Plaintiff claims that Chief Farley allowed her to be harassed by her co-workers and her position was eliminated in retaliation for the Plaintiff voicing her concerns about various issues within the police department over the course of her employment.

---

[38]   Id. at 4; Exh. 6, City of Crystal River Personnel Policies.

[39]   Doc. 36, Part 4, Affidavit of Susan R. Boyer, pg. 4.

[40]   Doc. 36, Part 2, Deposition of the Plaintiff, pg. 9-10.

[41]   Id. at 11.

[42]   Id.

[43]   Id. at 13.

[44]   Doc. 36, Part 6, Affidavit of Gordon Rowland, pg. 1.

Specifically, the Plaintiff testified that she believes her position was eliminated and the harassment against her was not stopped because she did not agree with Chief Farley's political activities;[45] she told the former City Manager, Phil Lilly, about her concerns with respect to the Chief's policies and political activities; she gave a deposition during the investigation of Chief Farley for holding a political meeting with state employees;[46] she confronted Chief Farley about him smelling of alcohol;[47] she participated in a meeting with police officers, union members, and family members to discuss the budget;[48] she expressed concern about nepotism in the department (regarding the Klyaps);[49] and she raised concerns about how other employees in the department were treated.[50] Chief Farley denied ever threatening anyone within the department with discipline or termination if they did not support certain city council candidates, and he testified that the Plaintiff's position was not eliminated for making complaints against him or anyone else.[51]

---

[45]     Doc. 36, Part 2, Deposition of the Plaintiff, pg. 22-23.

[46]     Id. at 28-29.

[47]     Id. at 51.

[48]     Id. at 32-33.

[49]     Doc. 36, Part 3, Deposition of the Plaintiff, pg. 34.  Chief Farley admitted that the Plaintiff brought this concern to his attention.  Doc. 43, Deposition of James Farley, pg. 10-11.

[50]     Doc. 36, Part 3, Deposition of the Plaintiff, pg. 39.

[51]     Doc. 36, Part 5, Affidavit of James Farley, pg. 3.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."[52] As the Supreme Court held in Celotex Corp. v. Catrett, the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.[53] If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."[54] The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.[55]

## DISCUSSION

Pursuant to Florida's Whistle-blower's Act, the following actions are prohibited:

---

[52] Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

[53] 477 U.S. 317 (1986).

[54] Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).

[55] Celetex, 477 U.S. at 324.

    (a) An agency or independent contractor shall not dismiss, discipline, or take any other adverse personnel action against an employee for disclosing information pursuant to the provisions of this section.

    (b) An agency or independent contractor shall not take any adverse action that affects the rights or interests of a person in retaliation for the person's disclosure of information under this section.

    (c) The provisions of this subsection shall not be applicable when an employee or person discloses information known by the employee or person to be false.[56]

For the Whistle-blower's Act to be applicable, the following information must be disclosed:

    (a) Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare.

    (b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty committed by an employee or agent of an agency or independent contractor.[57]

Courts apply the same standard used in Title VII retaliation claims when analyzing claims under Florida's Whistle-blower's Act.[58] In order to establish a prima facie retaliation claim the Plaintiff must prove that: (1) she participated in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the

---

[56]     Fla. Stat. § 112.3187(4).

[57]     Fla. Stat. § 112.3187(5).

[58]     Sierminski v. Transouth Fin. Cop., 216 F.3d 945, 950 (11th Cir. 2000); Allocco v. City of Coral Gables, 221 F. Supp. 2d 1317, 1367 (S.D. Fla. 2002).

participation in the protected activity and the adverse employment action.[59] If the Plaintiff succeeds in establishing the prima facie case, the Defendant must come forward with a legitimate, non-retaliatory reason for the adverse employment action.[60] The Plaintiff bears the ultimate burden of proving that the Defendant's reasons are pretext for prohibited, retaliatory conduct.[61]

The Plaintiff claims that she suffered two adverse employment actions in retaliation for the alleged protected activities she engaged in: (1) harassment by her co-workers; and (2) elimination of her position. The Court will address each in turn.

**I. Harassment by the Plaintiff's Co-workers**

The Plaintiff claims that Chief Farley failed to address the harassment by her co-workers in retaliation for making complaints against him and her co-workers. The Court concludes that summary judgment is due to be granted with respect to this claim because the Plaintiff has not produced sufficient evidence to establish a material issue of fact that the harassment she suffered qualifies as an adverse employment action.

"An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment

---

[59] Id.

[60] Id.

[61] Id.

opportunities, or adversely affects his or her status as an employee.'"[62] "Conduct that falls short of an ultimate employment decision must meet some threshold level of substantiality to be cognizable. . . ."[63] "It is clear, however, that not all conduct by an employer negatively affecting an employee constitutes adverse employment action."[64] "Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, using both a subjective and an objective standard."[65] To prove that adverse employment action occurred, the Plaintiff must show "a *serious and material* change in the terms, conditions, or privileges of employment."[66]

The harassment the Plaintiff complains of by the Klyaps was not sufficiently "serious and material" to constitute an adverse employment action. While sarcastic remarks, "rude" comments, "taunting", having things moved around on one's desk, and having a horn blown in one's ear may be considered annoying and unprofessional, these alleged acts had no effect on the Plaintiff's pay, benefits, or other tangible aspect of the Plaintiff's employment.[67] Morever, the record does not demonstrate that the actions of the Klyaps

---

[62] Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3rd Cir. 1997)).

[63] Id.

[64] Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001).

[65] Gupta, 212 F.3d at 587 (citing Doe, 145 F.3d at 1448-49).

[66] Davis, 245 F.3d at 1238.

[67] See, e.g., Dudley v. Metro-Dade County, 989 F.Supp. 1192, 1204 (S.D. Fla. 1997) (holding that supervisor's hostility toward the Plaintiff and his refusal to answer the Plaintiff's calls
(continued...)

can be attributed to Chief Farley or that he encouraged the Klyaps behavior. To the contrary, the Plaintiff's own written notes documenting the incidents of harassment by the Klyaps reveal that Chief Farley attempted to address their behavior, but the Klyaps' behavior seemingly worsened because the Plaintiff complained about them, not because Chief Farley instructed them to harass the Plaintiff due to her alleged protected activities.[68]

**II. Elimination of the Plaintiff's Position**

The Plaintiff's claim that her position was eliminated because she engaged in protected activities fails to survive summary judgment because she has not produced sufficient evidence to establish a material issue of fact concerning the third element of a prima facie retaliation claim – causation. The record reflects that the Plaintiff's position was eliminated as a result of the city council's decision to reduce the police department's budget in the 2003-2004 budget year, and there is no evidence to suggest that the city council was motivated by the Plaintiff's alleged whistle-blowing activities. Although there is evidence that Chief Farley may have recommended to the city council that the Plaintiff's position be eliminated, he was not the final decision maker with respect to the elimination

---

[67](...continued)
or to accept her paperwork, although they might create an unpleasant working atmosphere, do not rise to the level of an adverse employment decision as contemplated by Title VII).

[68] The Court has serious doubts as to whether all of the Plaintiff's complaints could constitute protected activity for purposes of the Whistle-blower's Act, which requires that disclosures concern "a substantial and specific danger to the public's health, safety, or welfare" or an "act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty." Fla. Stat. §112.3187(5)(a). However, the Court is mindful that the provisions of the Whistle-blower's Act are to be read liberally. Irven v. Dept. of Health & Rehabilitation Servs., 790 So. 2d 403, 405-06 (Fla. 2001).

of the Plaintiff's position.[69] And even if the Court assumes that Chief Farley was the decision maker with respect to the elimination of the Plaintiff's position, there is insufficient evidence to establish a causal connection between Chief Farley's elimination of the Plaintiff's position in September of 2003 and the Plaintiff's alleged protected activities which occurred in the beginning of 2002.[70] It is also pertinent to note that the offer of another job to the Plaintiff (which she rejected) at the time of her separation, and her subsequent reemployment when her job was reestablished in 2005, both confirm an economic motive rather than retaliation in the elimination of her position in 2003.

## CONCLUSION

Accordingly, upon due consideration and for the foregoing reasons, it is ordered that:

(1) the Defendant's Motion for Summary Judgment (Doc. 35) is GRANTED; and

(2) the Clerk is directed to enter judgment accordingly, terminate any pending motions, and close the file in this matter.

IT IS SO ORDERED.

---

[69] The Plaintiff admitted that she had no personal knowledge pertaining to who the final decision maker was with respect to layoffs within the city departments. Although the Plaintiff claims the finance director told her that it was Chief Farley's decision to eliminate her position, the finance director only testified that Chief Farley *suggested* that the Plaintiff's position be eliminated.

[70] See Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004) (holding that a three month period by itself does not provide a reasonable inference of a causal relation between the protected expression and the adverse action).

DONE and ORDERED at Ocala, Florida this 8th day of May, 2006.

UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record